The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oh, yeah. Oh, yeah. Oh, yeah. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nine. Give their attention for the court is now sitting. God save the United States in this honorable court. Morning. Morning. You're happy to have you with us here in Richmond live. And, um, we look forward to hearing from you. Um, we're happy to your argument in our first case. Number 20 16 30 1988 Trust for the Allen Children. Um, versus Banner Life Insurance Company. Mr Sloan. Mhm. Thank you, Your Honor. May it please the court. Jevin Sloan for the appellant. The 1998 Trust for the Allen Children and I, too, am happy to be here live once again. In 1991, this court held an NRA Jiffy Lube securities that the primary concern addressed by the requirement that a class action settlement be, uh, be the approved by district court is the protection of members whose rights may not have been given adequate consideration during the settlement negotiations. This illustrates the primary issue that we raised in our objection and now in this appeal for the district court's final approval of the settlement. In this case, an overruling of our objection. The appellant is a trust that technically fits within the settlement class definition in this class, but that has a different claim in a different injury that was not encompassed within the allegations in the Dickman complaint. Nonetheless, the overbroad release in this settlement purports on its face to extinguish to extinguish these distinct and separate claims. And in fact, the defendant Banner has admitted that one of the purposes of this release language was to do just that to extinguish the claims relating to what we call in our objection deficit account harm belonging to the Allen Trust and other class members. The two primary questions on this appeal, both of which we believe the district court answered improperly are first. Do the Dickman plaintiffs have the same interest claims and injury as the Allen Trust and other similarly situated class members such that these claims related to deficit account harm can properly be settled and extinguished by the release in this case? So we agree with you that the class shouldn't have been certified. Uh, it's a class settlement then vacated as a matter of law. It would be our position. Yes, Your Honor, that we would ask for a reversal of the approval, and then it would be up to the Dickman parties to determine what they want to do from there. Certainly, as the judge below noted, they could go back to the bargaining table. They could move forward with the case, but what they can't do is move forward with a settlement that extinguishes claims that aren't part of their case. And we would say that the answer to this question on whether the deficit account harm is part of this case is clearly no, as evidenced by the claims and injuries as described in the Dickman complaint itself. If that is true, the answer is no, they shouldn't be part of this claim. Clearly, the settlement agreement releases overly broadened on that basis alone. The final approval should be reversed. Does your client also have a cost of insurance harm as you term it? I thought they had about 36,000 or so in the account when the cost of insurance rate increased. Do you have both harms, or is your argument on the facts that you only have the deficit account harm, the negative account? Well, Judge Rushen, we have not been able to explore that fully in discovery, but that is certainly the reason we are told we're part of this class. It has been represented to us by both Banner and by the Dickman plaintiffs that in 2015, that's the class. In 2015, we were subject to a COI rate increase, and your honor is correct that during that time period, our positive account value was reduced to zero. So in that respect, we might have the COI harm that they're talking about. The problem is we have alleged and we have discovered something much different, and that is, and we can move right to that, which is the answer to the first question. A class action settlement is clear under Fourth Circuit precedent, Berry versus Schulman. A class action settlement can only release those claims that are based on the, quote, identical factual predicate as the claims underlying the settled actions. So the first step is what was alleged in Dickman? What is the factual predicate of this case? As Judge Rushing pointed out, it's COI harm. So let's talk about what that is. The Dickman plaintiffs purchased universal life insurance policies and paid excess premiums to accumulate a positive cash value. Dickman alleges that they did this based on certain representations from Banner about the financial condition and stability of the company. They relied on those representations. In reality, Dickman alleges Banner was actually in dire financial condition and needed cash. So to obtain this cash, Banner rated the positive cash value that these particular class members had accumulated through the payment of excess premiums. The Dickman case is centered around Banner obtaining essentially a capital infusion by clawing back actual cash from positive account values of policyholders who paid excess premiums. How do we know this? If you look at the complaint, paragraphs 24-28 of the Dickman complaint, they explain that each of the plaintiffs paid excess premiums to accumulate a positive cash value. Shortly thereafter, paragraphs 30-31, they allege that Banner in turn rated that positive cash value by taking cash back. Paragraph 202, Banner is to quote, Banner is paying itself the increased COI charges by taking money from the policy's accumulated cash values. In paragraph 206, Banner's conduct was intended to have plaintiffs, quote, pay excess premiums and build the policy's cash value. Is there a difference between the deficient account harm and negative negative account values? Your honor, the deficit account harm is a negative account value. And that is something that the district court latched onto and thought that that was pivotal. We've never disputed that deficit account harm was negative account value. We define it as such. The problem the district court made is that it said, well, deficit account harm is nothing more than negative account value and the Dickman case dealt with negative account value. Here's how we know that that cannot be reconciled with the allegations in Dickman. If you look at the real theory of the case, why that, what did the Dickman plaintiffs say was the reason Banner did this? Paragraph nine of their complaint, Banner raised these COI rates to find new cash. That's a quote. I thought it was also to get them to relinquish their accounts. Wasn't that one of the allegations? The other one was to rid itself of near term liabilities. Another way to raise cash, save cash in the short term. It was either to rate to find new cash or to get policyholders to surrender policies to avoid near term quickly appreciating liabilities. Same allegation of paragraph 236. That is the why, that is the reason why the Dickman plaintiffs said that Banner did what they did. Deficit account harm, these negative account values, is entirely different. We did not pay excess premiums. We did not build up a positive cash value through excess premiums. We did have a positive cash value for a little while from our minimum level premiums, but we did not pay excess premiums. Rather, we paid the level minimum premium required under the policies to make sure that policy stayed in force for the full guaranteed period. And we did this relying on disclosures within the policy documents that allowed us to reasonably predict what we would have to pay in year 21 to extend the policy. Now Banner says when we chose to level premiums, we converted this to a term policy. That's not true at all. We knew there would be more money due in year 21. We believed that we would be able to reasonably predict that based on the maximum COI rate allowed in the policy documents. What we found out in 2018, solely because we were trying to pursue a life settlement of this policy, we found out for the first time that despite Banner sending us account statements month after month showing that we had a zero or more cash value, never, never a negative account value. Despite that fact, Banner was secretly accumulating a negative account value, a deficit account, that it would then, that it intended to then charge us as a catch-up premium in year 21. Prior to finding that out through our exploration of a life settlement sale, there was no notice, no indication, we had no idea that there was a negative account value building below the surface. Well, the district court seemed to think that your damages were speculative. I mean, that was that was the whole problem, I think, that he thought with what you were saying. And if you just look at the contract as you so far have discussed it, your clients do not suffer any financial harm until what, they're 95? Well, 96 would be when the year 21 premium would be due, your honor. Yes. And so what do you have to say to that? Well, that's certainly a position that the Dickman parties took and that's a position that the district court agreed. We obviously disagree. Why is that wrong? It's wrong because we actually articulated three different damage models in response to our interrogatories that were served on us. One was, in fact, the present value of this deficit account harm. This is if you wanted to sell it. No, no, no, your honor. This is if this is a deficit account harm that was accruing that we would have to pay in year 21 if we extended the policy. Yeah, but that isn't that isn't damage as of this moment. Well, your honor, we have cited cases that that even future damages when they are when they can be reasonably anticipated and there's a solid basis for them, even future damages would not be speculative. You said you had three basis. Yes, your honor. The second one is the actual premiums that were paid. It's our position by banner doing what they did. They sold us. They purported to sell us a universal life policy, a permanent life insurance product. But instead, they just sold us really a term policy. We didn't get what we paid for. And so a refund or disgorgement of those premiums would be a remedy as well. It's that banner and the Dickman plaintiffs take the position that refunding premiums is appropriate for the people who suffered this C. O. I. Harm the reduction of their positive cash values. But for some reason, it's not appropriate damage for these, uh, class members like the Allen Trust. Well, you understand the difference you got. You got the coverage, right? You paid for the coverage you got. The question is what happens at the end? Well, we did not pay for a term product. We paid for a universal life policy that we believe, based on everything that was told us, could be extended through as a permanent life insurance product. So yes, we did get a term policy, but that's not what we bought, and that's not what paid for. And of course, the third element is the reduction in value, which is illustrated by the fact that we could not. This is a worthless policy in the life settlement market. Those that you had some sort of maybe it was from an expert, an estimate of what you should be able to get for this. We did. We did have an estimate of what we had value to that and what it would have been valued at if it had been handled correctly, if there was no deficit account. And so that would be the measure of that damage, because now we can't get anything. And I believe it was somewhere. It's in the record. I believe it's somewhere south of $300,000 is what that particular damage for that class member is. The district court didn't analyze those two other elements of damage. And we also believe that even as to the first element of damage, the analysis was incorrect. But again, these are going to the merits of the Allen Trust deficit account harm. We don't believe that is an appropriate analysis for the Dickman plaintiffs or the defendants to have done, because it does not fall within their case. Deficit account harm has nothing to do with excess premiums. It has nothing to do with positive cash value that Banner could then claw back to raise cash. And that's, of course, the very important part I raised with Judge Floyd is that that was a key holding by the district court that Banner has to do with negative cash value. The entire theory of Dickman is that Banner did this to find new cash or to cause policyholders to surrender their policies in the short term. Secretly driving an account into a negative hole without the policyholder knowing does not in any way bring in cash for Banner, nor could it cause a policyholder to surrender their policy in the short term. There is simply no construction of the Dickman complaint and their theory of liability that the Dickman plaintiffs have set out that can encompass this deficit harm. The problem is we don't have the common answers required for commonality. We don't have the aligned interests required for typicality and we don't have the same injury required for adequacy. As this court put it in the Sharp Farms case 917 F3D 276 pinpoint side of 280, we have the same problem as Sharp Farms. We have divergent legal theories and we have a fundamentally different interest in a different injury. And if we move on quickly, I see I'm down to two minutes, we can move on to the fairness inquiry under 23E. Even if it is proper, these claims were properly included within the release, the 23E analysis fails as well. That is the analysis of was this fair to class members like the Allen Trust and we say no. It's undisputed that the damages that were negotiated during the settlement didn't include any of this deficit account harm or account values that we describe in our complaint. Banner has for the plaintiffs to make such a calculation. It was never considered. Can I ask you how is the class formed? I'm sorry, Your Honor. Advertised. How is the class formed? I'm sorry. I don't know. Could you rephrase your question, Your Honor? I'm sorry. Yes. The people that are in the class. How did the lawyers find them? I guess what I'm asking you, Your Honor. I don't know that because it wasn't it about your class. They reached out. They came to us. The Allen Trust came to us. Is it only the Allen Trust? Are there other people? The Allen Trust is the only trust we represent. But based on what happened here, we believe there are other people and that's the point of our objection. Um, and it's a it's a situation that this court actually pointed out in in Ray. I mean, in this, uh, I'm sorry, the Second Circuit pointed out a national super spuds when you have a situation like this where there's one objector, it doesn't have as much of an impact on the analysis when the point of the objection, this is a quote, is limited to a few whose interests are being sacrificed for the benefit of the majority. And this is the important part. It means even less when, as here, the notice of settlement did not adequately apprise class members who also held claims in respect on unliquidated contract that these two were being placed on the block. Although these class members were to receive nothing in return, nothing in the complaint, nothing in the settlement agreement, nothing in the class notice. Put any of the class members on notice that they had these actual negative account values and they were being forced to release them with no compensation whatsoever. Your Honor, I see my time is up. Unless the panel has any questions, I'll sit. Thank you very much. Thank you. Yeah. All right. Yeah. Yeah. Question. Oh. I uh Yes. Ah yes. Er Go batter with work that are projects and no one that if they can see that any of the claims if they're also would be released. Yeah, this is happens steadfastly claims that none of their claims or cause of action or on the C. O. I. Inference. If that is the case, the release that they're concerned about does not report or any of their claims. Can I ask you a more fundamental question? Because it troubled me. Did the district court abuse its discretion in the way it certified the settlement? You know, we usually think when you go look at a class action, there's certain factors you look to. And I know you say that some of them the other side waved, but in fact they didn't. I mean, I found the argument in the J. A. Well, in terms of the 23 a requirement, yes, the district court may find his own appropriate record. That's limited approval studies that the requirements 23 A and 23 B. Three were met. You would concede that the district court has to make those kinds of findings, and it has to abide by what the rule says because the district court seemed to think that your proficiency is a lawyer. And I'm sure that that's true. Sort of erased every other concern. I hope that with all due respect, I don't know that I would agree with that statement, Your Honor. Well, the district court says there's there's no problem with this because we all know that you're we have great lawyers on either side and then doesn't do numerosity, commonality, typicality and thinks adequacy of representation deals with the quality of the lawyers. And that may be part of it. But another part of it is whether you're you represent the all of the people in the class all that impact you for it. So 38 and then final approval would 28. Maybe maybe reference to the specific findings. Now, he carried forward his findings from the preliminary injunction preliminary stage but we made a record of numerosity, commonality, typicality, adequacy. Okay, so you tell me where you think those findings are. The district, not your argument, the district court's findings. One page. That's a lot of findings for one page. Um, and then on the final approval stage, works in 28 99. So well, Mr. So we're in that order. Did the district court either oral or written order? Where did he ever compare the claims between the Allen Trust and the Dickman Trust Dickman representatives? Where did you do that comparison? In the transcript, your honor, he made detailed findings regarding what deficit account form was that was in fact negative account value and that negative account value had been taken into consideration as part of the settlement negotiations with the overall committee. Did he put that in a written order that we can see? Uh, uh, I have to go back and double check. I don't want to tell people something. But in the final approval order that came after his findings and his ruling on the record, I'm not sure that he discussed in detail what he did on the record. Well, do you agree or claims of the Allen Trust are in fact different from the Dickinson folks? They claim one of the things that what? Okay, they claimed. So how is it from your position that they aren't different? Yeah, their claims are not based upon some or all of their claims are not based upon the C. O. I. Increase and their claims are distinct and the release does not work to release those ones. For instance, our claims in essence, a fraud in the industry that they thought they were buying a permanent life insurance product and receive a term fraud. That has nothing to do with C. O. I. And leaving aside whether that claims meritorious or not, that claim is not in the Dickinson case and the release doesn't work to release that claim because it is untethered. C. O. I. It doesn't arise from the same factual credit. And one of the reasons I'm sorry I thought in response to, um, addressing this question that your colleague on the other side said that in fact, some of this money that they're claiming might be or was C. O. A. Money. That's my first question to you. And the second one is, well, if it seems to me that what you're saying is if it is C. O. A. Money, it's covered by this settlement. And if it's not, it's a different case and they should go forward. Is that what you're saying? That's correct. If it is not C. O. I. Related, if the claims in Allen are not, do not arise from the C. O. I. Cost of insurance increase that occurred in 2015, but I, I took from what he said that you have a situation here where some of their claim is tied to the C. O. I. And some is not. So that would sort of defeat your argument or damned if you do and damned if you don't. But they're saying they have both. Banner says that it is. Allen says it is not. That factual dispute and the record they created on a notion is in the Allen case, which we're not in. And that is what how this, this guy hijacked and down a rapid trail. This is not a simple objection of the settlement's unfair. Allen has made it clear on the record, but for the issue of the release, they have no problem with this settlement and none of the other 11, almost 11,000 policyholders had a problem whatsoever with the settlement. It is fair, it is reasonable, and it was done at arm's length over a six-month protracted mediation process. But having said all that, you can understand if the release releases their claims, even though the settlement is fair and appropriate, negotiated over at arm's length over a long period of time, that they have a claim. You may not think it's worthwhile, but it's not as if they came in from the blue. But as you've seen in a number of the cases that are cited, there are instances where you're in a class, have certain claims in a class that are being surrendered in exchange for consideration, and you have other claims that are completely unrelated. And those claims are preserved. Here, Allen is in this class as it relates to the policy and the COI inquiries, and they're going to receive relief for the COI claims. The release doesn't purport to release anything other than COI claims and the same factual credit. Okay, I think your time has expired. Your colleague is anxious. Thank you. I would say we'll just go forward for this afternoon's panel. I'm sure it's not going to be too long. I'd like to go directly to some questions about records. It's a textbook record. How long have you been a program team? How long have they not been a program team?  How long have they not been a program team? The second error statement, the judge noted that there are many points found in the error record. All the submissions were all for the study version. In terms of its findings, the judge addressed all of the old 23 factors, including the kickback to the record. At the end of the next two weeks, it's one, three, two, three, eight, six, seven. Also, in the final approval, the new program that we are approving for findings at 2902, it addressed the old 23 factors at 2904 through 2905. Judge Bennett also said in that order that the court had allowed for limited discovery to determine if any of the claims brought by the Allen Trust in a separate lawsuit were subsuming within this matter. If so, they were fairly and adequately compensated. So, which the judge found that they were subsuming and they were fairly and adequately compensated. That was specifically 2865, 2867. Judge Bennett's error kit program here is no pure use of discretion at all. In fact, it's finding protocol to protect the court. I could go on and on now to the complaint. The complaint, as we said, emphasized that the trust office increased COI charges, not limited to positive account value or excess premiums, as the Allen Trust has said. The Allen Trust carried this certain paragraphs of the complaint that were on aspects of the fraud claim that involved excess premiums. It's very clear from the record. I will put your honors to the record. This is the complaint, pages 107 to 114 of the joint appendix, and this is the heart of the complaint, paragraphs 224 through 234, alleging that, as to each product type, that matter was not justified in increasing COI charges. Another example, page 118 of the joint appendix, paragraphs 248 to 249, alleging that Banner breached the contracts by violating its duty to determine the correct time of rededuction of COI's account. And we're grateful for the consistency of their lives, that's a very specific case. I don't want to go on and on. It's pages 120 to 121 of the appendix, a number of paragraphs alleging that Banner was untrustingly enriched by paying premiums and excess premiums. It's not limited to excess premiums. We don't want to be limited to almost four years of account pressure, pressure that we're not going to be able to do what we were going to for remediation. That's what was said. So, as a complaint, it's appropriate to direct a complaint to the release. The release is effective. It should comply with exactly the tracts and allegations of the complaint, and it is in full accordance with the Fourth Circuit law, expressly limited to based on the same factual fact. Where and when will it be sorted out which claims that the Allen Trust brings are covered by the release or not covered? I know there's the California litigation, and I don't recall offhand if that was transferred or if that's just stayed while this is happening, and at some point another judge is going to determine whether a case that they want to press are covered by the release or not. That's correct. The California case was transferred. Okay. So, Judge Bennett will be the one who decides. But that assumes that this release is necessarily going to the court for many issues with the Allen Trust. Right. You might have other arguments. But I'm assuming the release is – whatever the arguments are, Judge Bennett will have a say on the case. The Allen Trust admits in its reply, and it says, that this is not the case to resolve whether the merits of the claim is in the case. The merits of the claim is in the Allen Trust. So, I'm just inquiring to hear that. I want to go to the negative accounts. Judge Bennett made a very careful point. There are factors in that discovery. He ordered a supplemental brief to determine. Did he do exactly what he was doing? He said, at the first final hearing, he said, at the first final hearing, before he understood the Allen Trust argument, this is a joint index, 1740 to 4. He said, I'm allowing discovery to determine the extent to which you do the Allen Trust, and if there are other damages that may or may not be present. And I'm interested in having some clarification as to whether or not there's a distinction between the cost of insurance appearances and whether or not they're intertwined with the recall to deficit account. And they are. The evidence is uncontroversial that the increased COI charges that deficit account is the same as negative account. The negative account value is compromised on the base COI charges. Banner submitted two sworn actuarial declarations in the California proceeding, Joint Index 880 and 1306, saying that the negative account value that's directly related to the increase in COI rates can be plausible. Then, in the Dickman proceeding, initial discovery order by Jeff Beck in March of 2020, Banner served a verified and realized word of response. This is at 2931 of the Joint Index, saying that the potential future negative account value is compromised on the base COI charges. Also, as stated, I think there's a parenthetical reference there is the annual expense charges, which are a tiny fraction of 1% of the rate. So, help me here. I think I'd understood that they covered the same subject matter, but I thought it was sort of at different times. The negative account value is what they're valuing. They're saying that the account is less because of these things, and the deficit account harm is what relates from that, what that factor is. Do you understand what I'm saying? Go ahead. Mr. Driscoll, is it possible or could the Allen Trust get a cash payout on their policy? Well, it's interesting. The point that was raised, the Allen Trust has a deficit account. Well, I mean, the question is, can they get a cash payout? It was raised by the Allen Trust a moment ago. It was meant to be a verified word of response. So, the policy, there's an erotic word. It's at 2123. My question is very simple. Can they get a cash payout on their policy? Oh, to surrender the policy? Yes. They can't get cash? Yes. Well, let's assume that they can't. Then how would the Dickman representatives be adequate in this case? Because the negative account value, this is a very critical point. Negative account value is totally speculative because they have never paid any of it. This is a policy matter. It's the future of the policy. It's described as a special case. Negative account value keeps the policy in force. The Allen Trust never has to pay it. It doesn't have to pay it. It never will have to pay it. If the policyholder dies within the next two years, we'll get $4 million. What if the policyholder dies at 102? Well, even then, Your Honor, this is very important, too. In order to get to the point of the end of the guarantee period, the policyholder needs to continue to pay the minimum premium and needs to decide at the end of the guarantee period that it wants to keep the policy in force. This trustee and many other depositions, they don't need a policy right now. They haven't needed it for several years because of this big and hot moment of death tax. Well, there's quite a difference between, I understand with rich people, between needing money and wanting money. And if the money is theirs, I dare say they want it even if they don't need it. Can they sell their insurance policy on the market? Does it have any value? ... ... ...  ... ... ... ... ... ... Well, did you have some sort of expert come in and say that it wasn't that? Do we have any contrary evidence in the record about the value of their policies on the market? ... ... ... Right, so you're conceding that you say that's its value. Is that what you're saying? ... ... But can they sell it for that? Will anybody give them that? Do you have any evidence that anybody would pay that for?
judges: Diana Gribbon Motz, Henry F. Floyd, Allison J. Rushing